## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PFIZER INC., <br><br> Plaintiff, <br><br> vs. <br><br> NOVO NORDISK A/S, NN US INVEST, INC., NOVO NORDISK US RESEARCH INVESTMENT HOLDINGS, INC., METSERA, INC., ARCH VENTURE FUND XII, L.P., ARCH VENTURE FUND XIII, L.P., VALIDAE HEALTH, L.P., and POPULATION HEALTH PARTNERS GP, LLC, <br><br> Defendants. | Civil Action No.: <br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Pfizer Inc. ("Pfizer"), by and through its undersigned attorneys, as and for its complaint against defendants Novo Nordisk A/S ("Novo Nordisk"), NN US Invest, Inc., Novo Nordisk US Research Investment Holdings, Inc., Metsera, Inc. ("Metsera"), ARCH Venture Fund XII, L.P., ARCH Venture Fund XIII, L.P., Validae Health, L.P., and Population Health Partners GP, LLC (collectively, "Defendants") alleges, on personal knowledge as to itself and on information and belief as to others, as follows.

## INTRODUCTION

1.      This action seeks to enjoin one of the most cynical and anticompetitive mergers ever contemplated:  Novo Nordisk's desperate bid to use the vehicle of an anticompetitive merger agreement to neutralize an emerging threat from an American company to its dominant market position in GLP-1 drugs.

2.      There are currently only two significant competitors in the U.S. markets for GLP-1 drugs.  There is Novo Nordisk, the Danish pharmaceutical company that launched Ozempic and Wegovy, and there is Eli Lilly, the maker of Mounjaro and Zepbound.  Novo Nordisk's market share in the United States is approximately 50%, reflecting Novo Nordisk's ability to charge Americans exorbitantly high prices for its life-saving prescription drugs—prices far higher than have been available overseas to non-Americans, including in its home country of Denmark.

3.      Pfizer, one of the largest and best-resourced pharmaceutical companies in the United States, has sought for years to break into the GLP-1 space and compete with Novo Nordisk. Pfizer's entry would drive down the price of GLP-1 drugs through competition and make those drugs more accessible to the millions of Americans who use them and the many millions more who need them.  But Pfizer's clinical trials were unsuccessful, and development of its GLP-1 drug was terminated in April 2025.

4.      In September 2025, Pfizer agreed to acquire Defendant Metsera.  Metsera is initiating a Phase 3 clinical trial for a next-generation GLP-1 drug and has a promising pipeline of GLP-1 product candidates behind it.  With Pfizer's infrastructure, expertise, and backing, Metsera is poised to disrupt and intensify the competitive environment that Novo Nordisk has dominated for years.

5.      Novo Nordisk, which is dependent on GLP-1 drugs for well over 30% of its revenue, could not abide the competitive threat presented by the transaction between Pfizer and Metsera.

6.      Novo Nordisk has had a rough year.  It has seen its stock price slashed in half, fired thousands of employees, and, days ago, ousted its independent directors in connection with a governance dispute with its controlling stockholder.  It is desperate to cling to its commanding

position in the American GLP-1 markets.  And it is desperate to stop Metsera and Pfizer from offering competing GLP-1 drugs to the tens, if not hundreds, of millions of Americans who could benefit from them.

7.      Metsera had previously rejected Novo Nordisk's bid for the company because it knew an acquisition by Novo Nordisk would be anticompetitive and virtually certain to be blocked by antitrust regulators.  The antitrust laws do not permit a dominant competitor in a highly concentrated market to eliminate emerging competitive threats via acquisition.

8.      But in October 2025, after the Pfizer deal had been signed, Novo Nordisk offered Metsera a higher dollar value based on a novel deal structure that would achieve Novo Nordisk's anticompetitive aims while sidestepping the fact that a Novo Nordisk/Metsera deal was destined to fail.  Metsera had previously rejected Novo Nordisk's approach—which would pay out Metsera and its controlling stockholders at signing—as too risky.  But this time Metsera was game.  Novo Nordisk and Metsera thus negotiated a merger agreement by which Novo Nordisk would pay over $6.5 billion to Metsera *immediately* upon signing in exchange for 50% of the economics of the company.   Metsera would then immediately and permanently dividend that cash to its shareholders, all *before* any regulator has an opportunity to review the deal and before any stockholder vote.  Only after funds and ownership have changed hands, and after Novo Nordisk has tied Metsera up with restrictions on its ability to compete, will the parties seek clearance from the government to close the back-end of their merger.

9.      As the terms of their negotiated agreement reflect, and as Metsera previously set out in its merger proxy for its deal with Pfizer, Defendants do not believe they will actually clear antitrust review and consummate their merger given Novo Nordisk's dominant market position.  Nor do they much care.  The parties have negotiated an extraordinarily lengthy "outside date" of

30 months—meaning the merger could be pending for two-and-a-half years—but omitted the typical obligations that merger parties require of one another to ensure the best chance at obtaining regulatory approval and consummating the merger.  Defendants have in fact structured their deal such that Metsera stockholders, who will be paid out at signing, may be incentivized to root *against* its ultimate consummation, so that Metsera can attempt to sell what is left of the company years from now.  That structure makes sense only if Defendants are getting what they want out of the deal as a result of the signing and pendency of the merger, rather than its ultimate consummation.  And they are.

10.    Metsera's and its controlling stockholders' motive to strike this anticompetitive deal is clear:  it lines their pockets now.  It makes no difference to them that the deal is anticompetitive and may never close.  To make matters worse, they are attempting to shield themselves from their unlawful actions by obtaining an unusually broad indemnity from Novo Nordisk for claims arising out of their proposed transaction—one that will kick in immediately upon the signing of the transaction and cover not just the Metsera directors, but their controlling stockholders and their advisors.  Such an indemnity is unheard of in M&A transactions.

11.    Novo Nordisk's motive is equally clear:  during the extended pendency of the proposed merger, Novo Nordisk will have enormous influence over Metsera's operations, finances, and R&D function under the merger agreement's terms (again, without any antitrust regulatory approval), and can forestall the competitive threat it faces for years—if not for good.  Novo Nordisk will be positioned to interfere with and choke off funding for Metsera's clinical trials and pipeline products, impeding its GLP-1 candidates even as they knock at the door of FDA approval.

12.     Effectively, Novo Nordisk is bribing Metsera, its board of directors, and its controlling stockholders to allow Novo Nordisk to control its fate and forestall Metsera's game-changing products from coming to market for as long as possible.  And if the products ever do come to market under Novo Nordisk's control, Novo Nordisk gets to build on its dominant market position rather than face unwanted competition.  The parties' conspiracy makes a mockery of the U.S. antitrust laws and premerger review requirements at a time when access to affordable prescription drugs could not be more important.  It is no coincidence that it was launched during the government shutdown.

13.     The proposed deal is also recklessly indifferent to the lives and health of tens of millions of Americans.  Obesity is a public health crisis in the United States, affecting roughly 70% of Americans according to some measures and exacerbating other diseases and overall mortality.  It is widely recognized as a leading cause of death in the United States, along with diabetes, which GLP-1s also treat.  Metsera has developed extraordinary GLP-1 drug candidates that have the potential to address that crisis more effectively than Novo Nordisk's legacy drugs.

14.     Pfizer is committed to bringing those drugs to market quickly and to competing vigorously with Novo Nordisk, which would inevitably result in lower prices, greater output, and enhanced product innovation, for the benefit of all Americans.  Novo Nordisk does not share these same incentives.  It wants to keep its stranglehold on the U.S. GLP-1 markets no matter the effect of its conduct on the health of Americans.  The antitrust laws were designed to prevent anticompetitive schemes of precisely the kind Novo Nordisk has concocted.  Something is clearly rotten in the state of Denmark.

15.    Novo Nordisk and Metsera should be enjoined from consummating any aspect of their merger and ordered to rescind any exchange of up-front merger consideration for Metsera stock.

## THE PARTIES

16.    Plaintiff Pfizer is an American, research-based, global pharmaceutical company headquartered in New York and organized under the laws of Delaware.  Pfizer currently has no GLP-1 products in-market or under clinical development for the treatment of obesity or diabetes. Through its signed agreement to acquire Metsera, Pfizer is poised to compete vigorously in the U.S. markets for GLP-1 drugs.

17.    Defendant Novo Nordisk is a Danish *aktieselskab* (stock-based corporation) specializing in the treatment of chronic diseases, and is headquartered in and organized under the laws of Denmark.  It is the manufacturer of Ozempic and Wegovy, two of the leading GLP-1 drugs on the market.  It is a party to a proposed merger agreement with Metsera.

18.    Defendant NN US Invest, Inc. is a wholly owned subsidiary of Novo Nordisk headquartered in New Jersey and organized under the laws of Delaware.  NN US Invest, Inc. is a party to the proposed merger agreement between Novo Nordisk and Metsera.

19.    Defendant Novo Nordisk US Research Investment Holdings, Inc. is a wholly owned subsidiary of Novo Nordisk headquartered in New Jersey and organized under the laws of Delaware.  Novo Nordisk US Research Investment Holdings, Inc. is a party to the proposed merger agreement between Novo Nordisk and Metsera.

20.    Defendant Metsera is an American clinical-stage biopharmaceutical company with a portfolio of obesity and metabolic disease drug candidates, headquartered in New York and organized under the laws of Delaware.

21.     Defendants ARCH Venture Fund XII, L.P. and ARCH Venture Fund XIII, L.P. are funds managed by affiliates of ARCH Venture Management LLC, an early-stage venture capital firm, and are headquartered in Illinois and organized under the laws of Delaware.  Collectively, the two funds are the largest stockholder of Metsera.  The funds are parties to the proposed Voting and Support Agreements in connection with the Novo Nordisk transaction, requiring them to vote in favor of that transaction and against the Pfizer transaction.

22.     Defendant Validae Health, L.P. is a fund managed by affiliates of Population Health Partners, a hybrid venture capital and private equity firm, and is headquartered in New Jersey and organized under the laws of Delaware.  After the ARCH funds, Validae Health L.P. is the second largest stockholder of Metsera.  Validae Health, L.P. is a party to the proposed Voting and Support Agreements in connection with the Novo Nordisk transaction, requiring it to vote in favor of that transaction and against the Pfizer transaction.

23.     Defendant Population Health Partners GP, LLC (together with ARCH Venture Fund XII, L.P., ARCH Venture Fund XIII, L.P., and Validae Health L.P., the "Stockholder Defendants") is the General Partner of Validae Health, L.P., and is headquartered in New Jersey and organized under the laws of Delaware.  Population Health Partners GP, LLC is a party to the proposed Voting and Support Agreements in connection with the Novo Nordisk transaction, requiring it to vote in favor of that transaction and against the Pfizer transaction.

## JURISDICTION AND VENUE

24.     This action arises under Sections 1 and 2 of the Sherman Antitrust Act (the "Sherman Act") and under Section 7 of the Clayton Antitrust Act (the "Clayton Act").  This Court has subject-matter jurisdiction over this action pursuant to the Clayton Act, 15 U.S.C. §§ 15, 26, and pursuant to 28 U.S.C. § 1331.

25.    This Court has personal jurisdiction over Defendants Metsera, NN US Invest, Inc., Novo Nordisk US Research Investment Holdings, Inc., ARCH Venture Fund XII, L.P., ARCH Venture Fund XIII, L.P., Validae Health, L.P., and Population Health Partners GP, LLC, as they are each organized under the laws of Delaware.  This Court has personal jurisdiction over all Defendants because each has sufficient minimum contacts with Delaware to satisfy its long-arm statute.  This Court also has personal jurisdiction over all Defendants pursuant to 15 U.S.C. § 22.

26.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), (c)(2), (c)(3). Defendants Metsera, NN US Invest, Inc., Novo Nordisk US Research Investment Holdings, Inc., ARCH Venture Fund XII, L.P., ARCH Venture Fund XIII, L.P., Validae Health, L.P., and Population Health Partners GP, LLC, each reside in the District of Delaware.  28 U.S.C. § 1391(b)(1).  Defendant Novo Nordisk is not a resident of the United States and may be sued in any judicial district.  28 U.S.C. § 1391(c)(3).  Venue in this District is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.  In addition, venue is proper in this District pursuant to 15 U.S.C. § 22.

## THE RELEVANT MARKETS

27.    There are two relevant product markets at issue in this case.  They are (1) the market for GLP-1 class drugs for the treatment of obesity and chronic weight management; and (2) the market for GLP-1 class drugs for the treatment of type 2 diabetes (the "Relevant Markets").  While GLP-1 drugs may have different clinical indications depending on their exact formulation and dosage, and may be combined with other agents, the therapeutic mechanism of action underlying GLP-1s is the same.

8

28.     The relevant geographic market for each GLP-1 product market is the United States.  GLP-1s cannot be marketed in the United States without obtaining FDA approval, and the drugs are sold nationally by their distributors.

29.     GLP-1s manage blood sugar levels to treat obesity and type 2 diabetes.  Glucagon-like peptide-1 is an incretin hormone made by the small intestine that stimulates insulin secretion after glucose has been orally consumed.  GLP-1 medications mimic this hormone to slow down gastric emptying, restrain the release of glucagon, and stimulate insulin production.

30.     GLP-1 drugs are distinct from other drugs used to treat obesity and type 2 diabetes because they have dual mechanisms of action:  metabolic control and appetite regulation.  Other drugs generally work by stimulating one or the other.  This unique formulation of GLP-1 drugs leads them to have superior efficacy and comparably better side effect profiles.  For example, with respect to obesity treatment, GLP-1s typically lead to a 15% to 25% reduction in weight after about one year of use.

31.     Novo Nordisk and other industry participants recognize GLP-1s as comprising distinct relevant product markets, as illustrated by Novo Nordisk's publication of figures showing its GLP-1 market share in the Relevant Markets.

32.     Americans faced with a small but significant non-transitory increase in the price of GLP-1 treatments could not and would not shift to other drug treatments such that the increase in price would be rendered unprofitable.

33.     Indeed, Novo Nordisk consistently raised the price of its GLP-1s (Ozempic and Wegovy) until it faced competition in the Relevant Markets from Eli Lilly (Zepbound and Mounjaro).  Novo Nordisk did not decrease prices when faced with competition from other non-GLP-1 products.

34.    Despite pressure from Eli Lilly, Novo Nordisk continues to enjoy large market shares and market power in the Relevant Markets.  Through the first six months of 2025, Novo Nordisk estimated its own market share of the GLP-1 class of products at 50% in the United States and 71% internationally.  There are no other competitors currently on the market in the United States aside from Eli Lilly.  Moreover, Novo Nordisk and Eli Lilly both have multiple GLP-1-based combinations in clinical development, which, absent competition from others, will preserve their market power well into the future.

35.    Aspiring entrants into the Relevant Markets face substantial barriers to entry, requiring billion-dollar R&D budgets and expansive infrastructure to achieve FDA approval.  Few are positioned to succeed.

## FACTUAL ALLEGATIONS

**A.    Novo Nordisk is a dominant competitor in GLP-1 markets.**

36.    Novo Nordisk is a massive foreign pharmaceutical company.  The blockbuster success of Ozempic and Wegovy propelled its revenues to $42 billion in 2024, with well over 30% of those revenues deriving from GLP-1 therapies alone.  Novo Nordisk's market cap at various points has exceeded the GDP of its home country of Denmark.

37.    It has also attempted to monopolize the market for GLP-1s in the United States. The only other competitor with material market share is Eli Lilly.

38.    Novo Nordisk has wielded its dominant position aggressively and abusively to prevent, hinder, and delay competition.  The FTC has accused Novo Nordisk of improperly listing patents in the FDA's Orange Book, potentially "delay[ing] lower-cost generic drug competition," "reduc[ing] patient access to more affordable alternatives," and "increas[ing] costs across the

entire health care system."[1]  With its $16.5 billion acquisition of Catalent in 2024, Novo Nordisk has sought to consolidate control over essential manufacturing facilities for GLP-1 drugs.  And Novo Nordisk has leveraged its market power to impose eye-popping prices for Ozempic and Wegovy, taking advantage of Americans who already contend with soaring healthcare costs and a broken insurance system.  Novo Nordisk's GLP-1s have retailed in the United States for more than 15 times the price available in other countries.

39.    In other words, Novo Nordisk has aggressively charged Americans more for the same life-saving treatments.  Its revolutionary products thus have been cost-prohibitive for the millions of Americans who wish to rely on them to treat obesity and type 2 diabetes—widely recognized as two of the biggest killers in the United States.  Tens of thousands of lives are lost each year because GLP-1s are not more widely available and accessible.

40.    Novo Nordisk's anticompetitive behavior has also drawn the ire of Congress.  In September 2024, the U.S. Senate Committee on Health, Education, Labor, and Pensions held a hearing at which the former CEO of Novo Nordisk was questioned on the high costs of Ozempic and Wegovy—including the fact that Novo Nordisk sells Ozempic for $87 in Australia but for *$936* in the United States.  Pfizer, on the other hand, is committed to affordable drug pricing for Americans.

41.    Novo Nordisk has also sought to eliminate threats to its dominance.  Consistent with its new CEO's recent boast that Novo Nordisk has built something "incredible" and will now "*defend it and expand it*," the company has been on a buying spree, sweeping up the rights to three

---

[1] Letter from R. Rao, Deputy Dir., Bureau of Competition, to S. Benz et al., Novo Nordisk Inc., (Apr. 30, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/novo-nordisk-ozempic-saxenda-victoza-_4302024.pdf.

rival GLP-1 candidates in this past year alone.[2]  Acquiring competitors does not mean Novo Nordisk will bring their products to market though.  In August 2025, the company shelved a promising obesity therapy candidate it had just acquired from a competitor, based in part on purported "portfolio considerations"—*despite* the candidate's success in clinical trials and "safe and well-tolerated profile."

42.    Novo Nordisk can engage in these anticompetitive tactics because it operates in highly concentrated markets and has substantial market power.  In particular, it does not currently compete with any GLP-1 products manufactured by Pfizer, whose own clinical trials for a GLP-1 were discontinued earlier this year following clinical trial results.  As noted, the only other major player in GLP-1 markets is Eli Lilly.

**B.    Metsera emerges as a substantial competitive threat to Novo Nordisk.**

43.    Founded in 2022, Metsera is a clinical-stage biotechnology company that develops next-generation GLP-1 products.  Metsera rapidly grew its product pipeline, with multiple Phase 2 candidates in clinical trials within years of its founding, a decades-long endeavor for many other companies.  And its lead GLP-1 product candidate, MET-097i, is currently initiating Phase 3 clinical trials, which most drugs successfully clear.

44.    Existing GLP-1 treatments on the market generally require weekly injections with complex, prolonged titration, tolerability issues, and limited scalability.  Metsera's MET-097i is a monthly injection that would directly compete with Novo Nordisk's GLP-1s and address these issues.  Metsera's platform also has the potential to produce active pharmaceutical ingredients more efficiently, and the monthly regimen likewise may substantially reduce the amount of product required, resulting in decreased manufacturing costs and increased scalability.  MET-097i

---

[2] *Meet our new president & CEO*, Novo Nordisk (last visited Nov. 2, 2025), https://www.novonordisk.com/news-and-media/latest-news/meet-mike-doustdar.html.

has potential category-leading scalability, tolerability, and convenience, giving Metsera a high degree of confidence that it could match or exceed the performance of in-market, FDA-approved products.

45.     Metsera's emergence in the GLP-1 space, with the potential to introduce superior products to those currently on the market, presents a direct and near-term competitive threat to Novo Nordisk's dominant market position.

**C.     Metsera rejects Novo Nordisk's takeover bid due to antitrust concerns and instead agrees to merge with Pfizer.**

46.     In 2024, Metsera began to consider a sale.  Metsera entered into confidentiality agreements with and provided diligence materials to several potential bidders.  In the ensuing months, it engaged with various bidders and received multiple offers.  As the process drew on, only two serious suitors remained:  Novo Nordisk and Pfizer.

47.     Pfizer and Novo Nordisk are both large, well-resourced pharmaceutical companies, with multibillion dollar R&D budgets that are well-positioned to provide the capital and infrastructure Metsera needs to effectively navigate Phase 3 clinical trials and commercialize approved products.  But when it comes to the GLP-1 markets, the similarities end there.  While Pfizer saw in Metsera an opportunity to vigorously compete with Novo Nordisk in one of the most important pharmaceutical markets in decades, Novo Nordisk saw an opportunity to squash an emerging competitive threat.

48.     The immense antitrust regulatory risk posed by a Novo Nordisk acquisition was obvious to Metsera throughout the parties' negotiations.  The antitrust laws exist to prevent the use of mergers and acquisitions to extinguish competition.  A market behemoth taking out an emerging competitor with a superior product is a classic antitrust violation, particularly in a highly regulated market with substantial barriers to entry.  Thus, Metsera repeatedly rejected Novo Nordisk's bids

over the summer and early fall of 2025 due to its serious concerns about the regulatory risks posed by a Novo Nordisk acquisition and its skepticism that Novo Nordisk's proposed deal would ever close.

49.    For example, when Novo Nordisk offered Metsera $39.51 per share on August 15, 2025, the Metsera board found Novo Nordisk's offer insufficient, citing "the regulatory risks associated with a transaction with [Novo Nordisk] for which Metsera would need to be significantly compensated, if it could agree to a transaction with such risks at all."[3]  The next day, Metsera informed Novo Nordisk that any acceptable offer would need to include a "very large termination fee" to compensate for potential regulatory failure.  Merger Proxy at 38.

50.    In contrast, while Pfizer too submitted multiple bids to Metsera during this period, Metsera's board had no regulatory or deal certainty concerns with Pfizer's proposals.  For good reason:  Pfizer has no competing products for sale in the Relevant Markets, nor does it have any GLP-1s in development.

51.    As negotiations wound to a close, Novo Nordisk also discussed with Metsera an alternative structure to try to address the fact that its transaction was highly unlikely to survive antitrust review.  Under this alternative structure, Novo Nordisk would pay Metsera $50 per share for a newly issued non-voting economic interest, after which Metsera would declare a dividend of $50 per share to distribute those funds to its stockholders.  Upon closing, assuming Novo Nordisk ultimately cleared the remaining regulatory hurdles, Novo Nordisk would issue a $37 contingent value right (CVR) tied to the realization of certain performance milestones.  In other words, Novo

---

[3] Metsera, Inc., Def. Proxy Statement (Schedule 14A) at 38 ("Merger Proxy") (Oct. 17, 2025), https://www.sec.gov/Archives/edgar/data/2040807/000119312525242494/d53787ddefm14a.htm.

Nordisk would pay most of the consideration at signing, which would quickly be distributed to Metsera's stockholders before the government could review and block the deal.

52.    Pfizer, for its part, submitted a final offer to acquire Metsera that was nominally lower than Novo Nordisk's:  $47.50 in cash, plus a $22.50 CVR, for a total net present value of approximately $54.71.

53.    Even though Novo Nordisk's bid was *higher* than Pfizer's, the Metsera board determined to reject it because of the immense regulatory risks it posed.  As Metsera explained in its merger proxy, "while the September 20 [Novo Nordisk] Proposal had a higher cash and nominal value than the Pfizer proposal, a transaction with [Novo Nordisk] presented a variety of risks," including "the previously discussed potential regulatory risks."  Merger Proxy at 45.  In particular, Metsera was concerned that "closing could be delayed by up to 24 months . . . if the closing occurred at all"; that the CVR component of the consideration "might only be paid after an extended period of time, if at all"; and that there could be an extended signing to closing period that could have a "significant negative impact on Metsera," including "its ability to attract and retain employees, continue the clinical development of its product candidates, [and] obtain funding."  *Id.*  In other words, a deal with Novo Nordisk would hamstring Metsera's ability to compete.

54.    A deal with Pfizer, on the other hand, offered closing certainty at a meaningful premium to Metsera's stock price.  With no competing products on the market or in clinical development, a Pfizer/Metsera merger faced no antitrust scrutiny and the deal could close promptly.  Moreover, Pfizer would be optimally positioned to achieve the CVR component of the deal given Pfizer's "extensive experience and resources," "business reputation," and "global

capabilities." *Id.* at 47.  Acknowledging this disparity, Metsera's board selected Pfizer's bid, and Pfizer and Metsera signed and announced their deal (the "Pfizer Transaction") on September 22.

### D.   Novo Nordisk seeks to extinguish the competitive threat posed by the imminent Pfizer Transaction.

55.    Pfizer's deal rationale was straightforward and procompetitive: provide its significant resources and apply its deep commercial and manufacturing infrastructure and expertise to Metsera's clinical portfolio, with the aim of shepherding Metsera's promising GLP-1 treatments through FDA approval and providing consumers with superior alternatives in a critical therapeutic area.

56.    As Metsera's co-founder and CEO commented in connection with the deal, the Pfizer Transaction "sets a path for our portfolio to potentially transform the lives of hundreds of millions of people," allowing Metsera to "join[] forces with Pfizer to leverage their global clinical, regulatory, manufacturing and commercial capabilities to realize the promise of improved human health at scale."[4]  The parties were granted early termination of the regulatory waiting period on October 31, confirming that the government harbored no regulatory concerns with the Pfizer Transaction.

57.    While the Pfizer Transaction was great news for the tens of millions of Americans clamoring for more affordable access to GLP-1s, it was catastrophic for Novo Nordisk.  Novo Nordisk was suddenly confronted not only with the emerging threat of Metsera, but Pfizer's ability to advance the development and future commercialization of Metsera's drugs.  Pfizer has a track record of bringing new drugs to market and is particularly well-positioned, and incentivized, to do

---

[4] Press Release, *Pfizer to Acquire Metsera and its Next-Generation Obesity Portfolio* (Sept. 22, 2025), https://www.pfizer.com/news/press-release/press-release-detail/pfizer-acquire-metsera-and-its-next-generation-obesity.

so quickly and effectively here. It is poised to revolutionize the obesity and diabetes space with Metsera's drugs, much as it did the cardiovascular space with statins through Lipitor.

58.     The news could not have come at a worse time for Novo Nordisk. Recent trials for a new GLP-1 drug had disappointed, its share price was plummeting, and its leadership was embroiled in a governance fight with its controlling stockholder. On October 21, its controlling stockholder ousted the board chair and independent directors in favor of its own designees.

59.     In turmoil, and intent on squashing any further competitive threats to its market position in GLP-1s, Novo Nordisk scrambled for another chance at taking out Metsera and derailing its deal with Pfizer.

60.     On October 25, more than a month after the announcement of the Pfizer Transaction and with that deal on a glide path to regulatory clearance and closing, Novo Nordisk sent Metsera yet another offer letter, reviving the reckless and virtually unprecedented transaction structure it had previously presented—and the Metsera board had previously rejected. This time, Novo Nordisk proposed an even higher up-front payment of $56.50 (with an illusory CVR of $21.25 per share, payment of which depends on regulatory approval of the anticompetitive merger), which alone exceeded the net present value of the Pfizer Transaction. Under this proposal (the "Novo Nordisk Proposal"), Metsera's shareholders stood to collectively extract more than $6.5 billion immediately upon signing, in exchange for Novo Nordisk's acquisition of a 50% non-voting economic interest in Metsera. Only after that immediate payment and dividend would Novo Nordisk and Metsera seek regulatory approval to close their merger.

61.     In other words, to address the fact that Metsera believed the deal would be blocked on competition grounds, Novo Nordisk offered to pay them out before anyone could do anything about it.

**E.    Metsera conspires with Novo Nordisk to abandon the procompetitive Pfizer Transaction and subject itself to an anticompetitive tie-up.**

62.    Satisfied that it no longer mattered if the Novo Nordisk deal never closed, Metsera went for it.  On October 30, 2025, Metsera sent Pfizer a letter indicating that the Metsera board had determined the Novo Nordisk Proposal was a "Superior Company Proposal" under Pfizer and Metsera's merger agreement that entitled Metsera to terminate the Pfizer Transaction.  Pfizer is challenging that putative determination in emergency proceedings in the Delaware Court of Chancery on various contractual and tort-based grounds.

63.    But the Novo Nordisk deal is unlawful for reasons entirely independent of those pending proceedings:  it is brazenly anticompetitive, struck in open defiance of the antitrust laws that Americans rely on to ensure fair competition in critical markets like healthcare and technology.

64.    As an initial matter, the proposed transaction structure seeks to circumvent the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act"), the pre-merger notification program which allows the federal antitrust agencies a 15- or 30-day period to review transactions before they close.  Virtually every major merger and acquisition in the United States is subject to the HSR Act and requires a filing by the parties triggering the waiting period before any consideration or share ownership can change hands.  Defendants are circumventing the Act by agreeing to pay effectively the entire deal consideration at signing in exchange for non-voting securities worth 50% of the company, without even the stroke of a pen on a required HSR Act notification form.  And Defendants have done so, not coincidentally, in the midst of a government shutdown—hindering the FTC's ability to respond and enforce the law.

65.    Worse, the transaction's terms are designed to tie Metsera's hands during the extended period between the signing and closing of the deal, thwarting the competitive threat it

poses to Novo Nordisk in the Relevant Markets.  Under the proposed structure, Metsera will be reliant on Novo Nordisk for funding of its operations during this critical interim period, effectively handing Novo Nordisk control over Metsera's competitive engine—its R&D function.  During this period, Metsera can only request funding from Novo Nordisk to cover its R&D and operating expenses in amounts that are set forth on a fixed budget agreed to by Novo Nordisk, a dangerous constraint in an industry where cost overruns from clinical trials are so commonplace as to be assured.  And Metsera will also be prohibited from obtaining funding from sources other than Novo Nordisk without Novo Nordisk's consent.  These are potentially existential conditions for Metsera given that the company has no revenue of its own and, absent financing, is set to run out of cash before it is able to commercialize its products.  Put simply, the deal is structured to place Metsera at the mercy of a competitor who is not incentivized to see it succeed.

66.     The interim operating covenants in the Novo Nordisk merger agreement would also directly restrict Metsera's ability to compete, subjecting Metsera's strategic decision-making and capital allocation to Novo Nordisk's approval.  For example, without Novo Nordisk's consent, Metsera cannot make or authorize *any* capital expenditures over $2.5 million or enter into licensing agreements with third parties.  Metsera is also limited in its ability to grant employees equity awards and bonuses, hamstringing its ability to hire and retain key talent (particularly after they have been paid out at signing).  For an upstart like Metsera, the departure of even a small number of employees—whom Metsera has called "vital" to its "long-term competitive advantage"—could have catastrophic effects on its programs and competitiveness.

67.     These restrictions are particularly egregious in light of the status of Metsera's most promising clinical candidates:  starting Phase 3 clinical trials, which the majority of drugs pass, but requiring immense financial resources and global infrastructure to make it to market efficiently

and effectively.  Pfizer has every incentive to facilitate this development; Novo Nordisk has every incentive to squelch it, particularly in light of the inevitability that its proposed acquisition will ultimately be blocked.

68.    Defendants' anticompetitive objectives are laid bare by the extraordinarily lengthy sign-to-close period in their contemplated merger agreement.  The proposed merger contemplates an "outside" date (at which point either party could unilaterally terminate) of *30* months.  An outside date of that length is essentially unprecedented given the burdens and uncertainties associated with pending merger agreements—it is an eternity in M&A practice.  For comparison's sake, the outside date in the Pfizer Transaction is *nine* months.  The only explanation for Defendants' approach is that Novo Nordisk is seeking to maintain its grip on the market, and to forestall Metsera's entry, for as long as it possibly can.

69.    A typical acquisition target would vigorously object to such a lengthy sign-to-close period and distant outside date.  But from Metsera's perspective, as long as it gets its cash up-front to dividend out to the Stockholder Defendants, Metsera does not care whether its contemplated transaction with Novo Nordisk actually closes.  In fact, the Novo Nordisk deal is structured in such a way that Metsera stockholders may be incentivized to root against it:  if the deal fails, Metsera can attempt to re-sell the company down the road—albeit after its value has been dampened while under the heavy thumb of a competitor.

70.    Associated terms in Defendants' proposed merger agreement underscore that Novo Nordisk structured the transaction not to clear regulatory review, but to maintain and exploit the pendency of its anticompetitive proposed merger for as long as possible.  Under the proposed "reasonable best efforts" covenant, for example, Novo Nordisk has no obligation to undertake any meaningful divestiture or remedy to address regulators' antitrust objections.  Similarly, the

proposed agreement contains no reverse termination fee in the event of regulatory failure—another term designed to protect the seller and ensure that the buyer works to close the deal, which Metsera had previously insisted on with Novo Nordisk when negotiating with it earlier this year.

71.    In effect, Novo Nordisk is paying for delay:  to delay regulatory review of its own transaction with Metsera, to delay the entry of Metsera's products into the market, and to delay the impact of heightened competition from superior products on its dominant market position.  And if Novo Nordisk somehow does obtain regulatory approval for its deal, as unlikely as that is, that too will only entrench its dominant position in the GLP-1 markets.  Novo Nordisk's message to Americans worried about access to affordable healthcare is clear:  Heads I win, tails you lose.

72.    Metsera and the Stockholder Defendants, who control four of Metsera's six directors, are on board with this anticompetitive scheme because they get to line their pockets now. No matter that Novo Nordisk's deal promises to destroy the GLP-1 pipeline that Metsera has built, thereby harming consumers, impeding competition, and flouting the antitrust laws.  From Metsera's and its controlling stockholders' perspective, it's not their problem.  After Pfizer informed them that their proposed deal is unlawful, they negotiated with Novo Nordisk for an unprecedented (and dubious) indemnity provision that not only begins at signing but extends beyond the company and its board to cover the Stockholder Defendants, their bankers, and their lawyers.

*      *      *

73.    It's not difficult to forecast, as a matter of basic economic incentives, what Novo Nordisk will do with its *de facto* control of Metsera while the parties traverse the long path to a regulatory block.  Seeking to sustain the performance of its own in-market products, Novo Nordisk will be incentivized to cut off funding to Metsera's clinical trials, delaying or killing its GLP-1

candidates even as they stand at the precipice of obtaining FDA approval and reaching consumers. Or it could drain Metsera's talent base, refusing to approve compensation grants to critical doctors and researchers. In the meantime, American consumers will lose out on the reduced prices and better products that promise to result from a Pfizer acquisition of Metsera. And after all is said and done, what's left of Metsera will not pose the same competitive threat to Novo Nordisk as it does today, whether as a standalone competitor or, in particular, in combination with Pfizer. If Novo Nordisk is successful, Metsera will not pose a competitive threat at all.

74.    Pfizer, on the other hand, with its signed agreement to acquire Metsera—and regulatory approvals in hand—was and remains in a position to bring its resources and expertise to bear in competing against Novo Nordisk with Metsera's innovative therapies. Its deal is undoubtedly procompetitive and would be ready to close in a matter of weeks, not years.

75.    Rather than compete on the merits, Novo Nordisk—with Metsera and the Stockholder Defendants as its co-conspirators—is seeking to eliminate a potential rival by paying it off, further entrenching its position as a dominant force in the GLP-1 market at the expense of the health and wallet of millions of American consumers. Absent Court intervention, it will succeed in doing so.

76.    The antitrust laws do not permit this conduct.

## CLAIMS FOR RELIEF

## COUNT ONE

## CLAIM FOR UNLAWFUL CONSPIRACY UNDER
## SECTION 1 OF THE SHERMAN ACT (AGAINST ALL DEFENDANTS)

77.    Pfizer incorporates and repeats each and every allegation above as if fully set forth herein.

78.    In a coordinated scheme, Defendants are seeking to enter into transaction agreements which will immediately grant Novo Nordisk beneficial ownership of and significant control over Metsera.  This conspiracy unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.    Defendants' entry into these transaction agreements will unlawfully and unreasonably restrain trade by, among other things, allowing Novo Nordisk to exercise significant control over Metsera's commercial operations and by preventing or delaying Pfizer and Metsera from entering the Relevant Markets and challenging Novo Nordisk's market power in those markets.

80.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in interstate commerce and have had and will have a substantial effect upon interstate commerce.  The unlawful conduct produces no offsetting efficiencies, let alone any efficiencies that benefit consumers.

81.    Pfizer is entitled to a declaration that execution of the Novo Nordisk Proposal would violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

82.    Pfizer is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

83.     In addition, Pfizer is entitled to damages in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

84.     Defendants' unlawful conduct is ongoing, irreparably injures Pfizer, harms the public interest, and unless restrained will continue.

## COUNT TWO

### CLAIM FOR ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (AGAINST NOVO NORDISK)

85.     Pfizer incorporates and repeats each and every allegation above as if fully set forth herein.

86.     Novo Nordisk has monopoly power or is attempting to obtain monopoly power in the Relevant Markets, with a market share above 50% in its own estimation.

87.     Novo Nordisk has repeatedly taken steps to entrench its market position, including by serially acquiring the rights to potential competitors and weaponizing intellectual property to stifle innovation and protect its dominant market position.

88.     By seeking to enter into an agreement to acquire Metsera and soliciting Metsera to abandon a procompetitive transaction with Pfizer that threatens Novo Nordisk's market position, Novo Nordisk has engaged in anticompetitive conduct with the specific purpose and intent of monopolizing the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

89.     The purpose of Novo Nordisk's proposed agreement to acquire Metsera is to enable Novo Nordisk to obtain a monopoly position in the Relevant Markets.  Among other things, it will allow Novo Nordisk to exercise significant control over Metsera's commercial operations and prevent or delay Pfizer and Metsera from entering the Relevant Markets and challenging Novo Nordisk's market power in those markets.

90.     If not restrained, there is a dangerously high probability that Novo Nordisk will obtain such a position.

91.     Novo Nordisk's acts of attempted monopolization are unlawfully delaying Pfizer and Metsera from entering the Relevant Markets and will otherwise stifle competition in those markets by, among other things, suppressing patient choice, blunting innovation, reducing safety and efficacy, and inflating prices.

92.     The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in interstate commerce and have had and will have a substantial effect upon interstate commerce.

93.     Pfizer is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

94.     In addition, Pfizer is entitled to damages in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

95.     Novo Nordisk's unlawful conduct is ongoing, irreparably injures Pfizer, harms the public interest, and, unless restrained, will continue.

## COUNT THREE

### CLAIM FOR CONSPIRACY TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (AGAINST ALL DEFENDANTS)

96.     Pfizer incorporates and repeats each and every allegation above as if fully set forth herein.

97.     Novo Nordisk has monopoly power or is attempting to obtain monopoly power in the Relevant Markets, with a market share above 50% in its own estimation.

98.     In a coordinated scheme, Defendants are seeking to enter into definitive transaction agreements with the specific intent of facilitating Novo Nordisk's monopolization of the Relevant

Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  The terms of the transaction agreements, among other things, will allow Novo Nordisk to exercise significant control over Metsera's commercial operations and prevent or delay Pfizer and Metsera from entering the Relevant Markets and challenging Novo Nordisk's market power in those markets.

99.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in interstate commerce and have had and will have a substantial effect upon interstate commerce.

100.    Pfizer is entitled to a declaration that execution of the Novo Nordisk Proposal would violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

101.    Pfizer is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

102.    In addition, Pfizer is entitled to damages in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

103.    Defendants' unlawful conduct is ongoing, irreparably injures Pfizer, harms the public interest, and unless restrained will continue.

## COUNT FOUR

### CLAIM FOR UNLAWFUL MERGER IN VIOLATION OF SECTION 7 OF THE CLAYTON ACT (AGAINST NOVO NORDISK AND METSERA)

104.    Pfizer incorporates and repeats each and every allegation above as if fully set forth herein.

105.    Novo Nordisk's entry into the transaction agreements to acquire an economic stake in Metsera would substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  Novo Nordisk's acquisition of Metsera would

likewise substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

106.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in interstate commerce and have had and will have a substantial effect upon interstate commerce.

107.    Pfizer is entitled to a declaration that the transaction agreements, if executed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.  Pfizer is entitled to a declaration that Novo Nordisk's acquisition of Metsera would likewise violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

108.    Pfizer is entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

109.    In addition, Pfizer is entitled to damages in an amount to be determined at trial, such damages to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15.

110.    Defendants' unlawful conduct is ongoing, irreparably injures Pfizer, harms the public interest, and unless restrained will continue.

## PRAYER FOR RELIEF

**WHEREFORE**, Pfizer respectfully requests that the Court enter judgment and relief against Defendants, as follows:

A.    Declaring that Defendants' conduct violates Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

B.    Declaring that Novo Nordisk's proposed acquisition of Metsera, including non-voting stock at the first phase of the proposed acquisition, violates Section 7 of the Clayton Act, 15 U.S.C. § 18;

C.      Enjoining Metsera from entering into or consummating any merger agreement with Novo Nordisk;

D.      Enjoining Novo Nordisk from further communications with Metsera, its officers, directors, representatives, and stockholders regarding the Pfizer Transaction, the Novo Nordisk Proposal, or any proposal to acquire an interest in Metsera;

E.      Enjoining the payment of any dividend by Metsera funded by consideration from Novo Nordisk;

F.      Rescinding the payments of any funds from Novo Nordisk to Metsera pursuant to a merger agreement and the issuance of any shares to Novo Nordisk;

G.      For any available form of damages, including punitive;

H.      For treble damages in an amount to be proven at trial;

I.      For pre- and post-judgment interest;

J.      For attorneys' fees and costs, to the extent provided by law; and

K.      For any other relief that the Court deems just and proper.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury on all issues and claims so triable.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Jonathan M. Moses (*pro hac vice* pending)
Nelson O. Fitts (*pro hac vice* pending)
Carrie M. Reilly (*pro hac vice* pending)
Ryan A. McLeod (No. 5038)
Adam L. Goodman (*pro hac vice* pending)
Beatrice R. Pollard (*pro hac vice* pending)
Jordan Cohen-Kaplan (*pro hac vice* pending)
Ethan Z. Cohen (*pro hac vice* pending)

WACHTELL, LIPTON,
ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

By: */s/ Kevin Shannon*
     Kevin R. Shannon (No. 3137)
     David E. Moore (No. 3983)
     Berton W. Ashman, Jr. (No. 4681)
     Callan R. Jackson (No. 6292)
     Tyler E. Cragg (No. 6398)
     1313 North Market Street
     Hercules Plaza, 6th Floor
     Wilmington, DE  19801
     (302) 984-6000

*Attorneys for Plaintiff Pfizer Inc.*

Dated:  November 3, 2025